Robert Tauler (SBN 241964)
Valerie Saryan (SBN 297115)
Dillon Malar (SBN 321325)
Tauler Smith LLP
626 Wilshire Blvd., Suite 510
Los Angeles, CA 90017
Tel: (310) 590-3927
rtauler@taulersmith.com
dmalar@taulersmith.com
vsaryan@taulersmith.com

Attorneys for Plaintiff
NUTRITION DISTRIBUTION, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NUTRITION DISTRIBUTION, LLC, an Arizona Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>IRONMAG LABS, LLC, a Nevada limited liability company, ROBERT DIMAGGIO, an individual, IRON MAG RESEARCH, LLC, a Nevada limited liability company, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:15-cv-08233-R-JC<br><br>Hon. Manuel L. Real<br><br>**PLAINTIFF NUTRITION DISTRIBUTION, LLC'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Action Filed: October 21, 2015<br>Discovery Cutoff: October 15, 2018<br>Pretrial Conf.: November 5, 2018<br>Trial Date: December 4, 2018 |

Pursuant to the Court's June 16, 2018 Order, Local Rule 16-4 and FRCP 26(a)(3)(A), Plaintiff Nutrition Distribution, LLC dba Athletic Extreme ("AX") hereby submits it's memorandum of fact and law for trial.

## 1) PLAINTIFF'S CLAIMS

### a. Summary of Claims

AX plans to pursue the following claims against Defendants:

Claim 1: Federal False Advertising Under the Lanham Act, 15 U.S.C. § 1125(a) for falsely claiming that Defendants' Ostarine products were legal and had no side effects when in reality they were developmental cancer drugs.

### b. Elements of Plaintiff's Claim and Evidence in Support Thereof

i. <u>Plaintiff's Claim</u>: Federal False Advertising – Lanham Act

1. Elements

1) *Defendants made a false or misleading statement of fact about their own product or another's product in commercial advertising.*

With respect to the first element, it is undisputed that Defendants have made false statements of fact about their products, specifically their express representations that Ostarine has no negative side effects, in some cases failing to disclose any side-effects whatsoever. With respect to Super DMZ 4.0, Defendants claim that, "unlike many steroids, side effects are basically non-existent."

Contrary to Defendants' representations, however, Ostarine has many side effects, including reduction in testosterone and testicular atrophy, rage, acne, balding and liver damage. Thus, the Ostarine Products are not recognized as safe and effective for any of the uses suggested by Defendants and may pose significant health and safety risks to consumers.

A statement is literally false when it unambiguously states something that is untrue. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir.

2007); *Scotts Co. v. United Indust. Corp.*, 315 F.3d 264, 275 (4th Cir. 2002). Here, it is undisputed that Defendants' representations regarding the Ostarine Products were false.

Indeed, numerous studies have shown that products containing SARMs have many recognized potential serious side effects, including reduction in testosterone and testicular atrophy, rage, acne, balding and liver damage. In fact, since Ostarine is only in phase II clinical trials, medical experts have emphasized that there is no evidence that Ostarine is safe for humans to consume as dietary supplements. Thus, medical experts and the FDA have unanimously concluded that the sale of products containing SARMs, like Ostarine, is 'highly dangerous to public safety.'

The FDA has since confirmed that Defendants' representations are misleading. On October 23, 2017, while this matter was pending appeal, the FDA took action against Defendants IML and DiMaggio by issuing a warning letter to Defendants IML and DiMaggio with regards to their sale of "Super DMZ 4.0." The FDA warned Defendants IML and DiMaggio that "Super DMZ 4.0" containing SARMs constituted a "new drug" under Section 201(p) of the FD&C Act and a "prescription drug" under 503(b)(1)(A) of the FD&C Act, such that Defendants' sale of "Super DMZ 4.0" constitutes "[t]he introduction or delivery for introduction, or causing the introduction or delivery for introduction, of a new drug lacking an FDA-approved new drug application (NDA) is a violation of sections 301(d) and 505(a) of the FD&C Act [21 U.S.C. §§ 331(d) and 355(a)]." As such, Defendants' product was "misbranded, and the introduction or delivery for introduction, or causing the introduction or delivery for introduction, into interstate commerce of this product violates section 301(a) of the FD&C Act [21 U.S.C. § 331(a)]."

  2)  *The statement actually deceived or has the tendency to deceive a substantial segment of its audience.*

  Where a statement is "literally false, a violation may be established without evidence of consumer deception." *Mutual Pharmaceutical Co. v. Ivax Pharmaceuticals, Inc.*, 459 F. Supp. 2d 925, 933 (C.D. Cal. 2006)(*quoting Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002). The First Circuit in *Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave.* (1st Cir. 2002) 284 F.3d 302, 314–315, explained that a presumption of deception to claims that are literally false "makes sense," when "a plaintiff demonstrates that a defendant has made a material misrepresentation that is literally false, [since] there is no need to burden the plaintiff with the onerous task of demonstrating how consumers perceive the advertising." *Id.* "Common sense and practical experience tell us that we can presume, without reservation, that consumers have been deceived when a defendant has explicitly misrepresented a fact that relates to an inherent quality or characteristic of the article sold. To presume as much requires neither a leap of faith nor the creation of any new legal principle." *Id.* See also, *U-Haul Intern., Inc. v. Jartran, Inc.* 793 F.2d 1034, 1041 (9th. Cir. 1986)("He who has attempted to deceive should not complain when required to bear the burden of rebutting a presumption that he succeeded.").

  Although the burden falls on Defendants with regard to this element, there is ample evidence that Defendants' statements regarding the health effects, and legal status are deceptive. Indeed, even the FDA has opined on the deceptive marketing of SARMs, with its director of the Office of Compliance in the FDA's Center for Drug Evaluation and Research stating "[w]e are extremely concerned about unscrupulous companies marketing body-building products with potentially dangerous ingredients. Body-building products that contain selective androgen receptor modulators, or SARMs, have not been approved by the FDA and are

associated with serious safety concerns, including potential to increase the risk of heart attack or stroke and life threatening reactions like liver damage."

Even without the FDA's official position on SARMs, it is self-evident that Defendants' false statements have a tendency to deceive a substantial segment of its audience.

3) *The deception is material*.

To be a material deception, the false or misleading nature of the advertisement must be likely to influence the purchasing decision. *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003); *Cook, Perkiss, and Liehe, Inc. v. N. Cal. Collection Serv.*, 911 F.2d 242, 244 (9th Cir. 1990). Plainly, false statements about the side-effects and legal status of the Ostarine Products are material since consumers are naturally concerned about the consequences of taking illegal and harmful substances. Similarly, Defendants false advertisement of the Ostarine Products as a "nutritional supplement" as opposed to an unapproved cancer drug banned by anti-doping groups is material.

4) *Defendants caused its false or misleading statement to enter interstate commerce*.

There is no dispute that Defendants sold the Ostarine Products in interstate commerce. (Answer DKT #39 at ¶41 ("Defendants admit that IronMag made advertising statements on its website and on the internet, and shipped products in interstate commerce.")

5) *AX has been or is likely to be injured as a result of the false or misleading statement*.

Injury Under the Lanham Act, courts "have generally presumed commercial injury when defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011). In *TrafficSchool.com, Inc.*, the

9th Circuit reversed the district court's finding at trial that the Plaintiff did not suffer injury because it failed to demonstrate a direct link from the false advertising to Plaintiff's profits. *TrafficSchool.com, Inc.* held that competitive injury can be presumed, reasoning as follows:

> There are good reasons to presume that a competitor bringing a false advertising claim has suffered a commercial injury. Competitors "vie for the same dollars from the same consumer group," and a misleading ad can upset their relative competitive positions. *Kournikova v. Gen. Media Commc'ns, Inc.,* 278 F.Supp.2d 1111, 1117 (C.D.Cal.2003). Moreover, the Lanham Act is at heart a consumer protection statute. *U–Haul Int'l, Inc. v. Jartran, Inc.,* 681 F.2d 1159, 1162 (9th Cir.1982) ("*U–Haul I*"); *see* 5 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 27:25 (4th ed. 2010) [hereinafter *McCarthy* ]; *see also* Alex Kozinski, *Trademarks Unplugged,* 68 N.Y.U. L.Rev. 960, 964 (1993) ("The great evil the Lanham Act seeks to prevent is that of consumers being duped into buying a watch they later discover was made by someone other than Rolex." (footnote omitted)).

*Id.* at 827. See also, *Lexmark Intern., Inc. v. Static Control Components, Inc.* (2014) 572 U.S. 118, 135–136 (citing *TrafficSchool.com, Inc.* for the proposition that "[e]ven when a plaintiff cannot quantify its losses with sufficient certainty to recover damages… disgorgement of the defendant's ill-gotten profits under § 1117(a)" is available.).

There is no dispute that Plaintiff and Defendants are direct competitors or that Defendants' representations have the tendency to mislead consumers. As such, Plaintiff is entitled to disgorgement under § 1117(a), as further detailed in the next section.

Injury can also be established either by direct diversion of sales from AX to Defendants or by a lessening of the goodwill associated with AX's products. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1054 (9th Cir. 2008); 15 U.S.C. § 1125(a)(1)(B).

## 2. Key Supporting Evidence

Plaintiff sells Advanced PCT and Mass FX Black, which are designed to build muscle. Defendants sell SARMs (Selective Androgen Receptor Modulators) including Ostarine, which are also designed to build muscle. Defendants' products that contain Ostarine are OSTA RX and Super DMZ 4.0 (the "Ostarine Products"). Plaintiff directly competes with Defendants in the supplement marketplace, and Athletic Xtreme's Advanced PCT and Mass FX Black directly competed with IronMag Labs' OSTA RX and Super DMZ 4.0 in the fitness supplement marketplace.

On October 21, 2015, Nutrition Distribution filed its Complaint against IronMag Labs and Robert DiMaggio, asserting a cause of action for false advertising in violation of section 43(a)(1)(B) of the Lanham Act. Plaintiff's lawsuit arises out of Defendants' "false and misleading advertising regarding its products "OSTA RX" and "Super DMZ 4.0" (collectively the "Ostarine Products") which are unlawfully marketed by Defendants as 'dietary supplements' and falsely marketed as having *no side effects*."

Defendants tout numerous purported health and physical benefits of the Ostarine Products, but falsely state that there are no adverse side effects. By way of example, Defendants claim that OSTA RX "increases lean muscle mass," "increases strength [and] endurance," "promotes fat loss," "promotes recovery," "increases libido," "increase[s] bone density," and "causes muscle growth in the same manner as steroids" – all with "no adverse side effects and 'no toxicity.'"

With respect to Super DMZ 4.0, Defendants claim that, "unlike many steroids, side effects are basically non-existent."

Contrary to Defendants' representations, however, Ostarine has several published side effects. For example, Ostarine has been found to cause "reduction in testosterone and testicular atrophy, rage, acne, balding and liver damage" and may have even more serious consequences that are currently unknown. In fact, there is no evidence that Ostarine is safe for humans to consume as a dietary supplement. Thus, medical experts and the FDA have concluded that the sale of products containing Ostarine as dietary supplements is "highly dangerous to public safety." Thus, Ostarine, and therefore the Ostarine Products, are not recognized as safe and effective for any of the uses suggested by Defendants and pose significant health and safety risks to consumers.

In addition, Defendants fail to disclose that Ostarine (and therefore the Ostarine Products), are specifically prohibited for use in sporting events by the World Anti-Doping Agency and the U.S. Anti-Doping Agency, and have led to numerous professional and amateur athletes being banned from competition. Indeed, Defendants target these unsuspecting consumers with their advertising, and claim that OSTA RX "has immense potential for muscle building for Bodybuilders, fitness, [and] athletes."

In reality, Ostarine is currently being investigated as a drug to treat muscle wasting diseases. As such, Ostarine is a "drug" since public trials have been instituted for researching its use as a pharmaceutical. Consequently, the Ostarine Products are "prescription drugs" as defined in section 503(b)(1)(A) of the FDCA [21 U.S.C. § 353(b)(1)(A)], because due to their toxicity or potentiality for harmful effect, the method of their use, or the collateral measures necessary for their use, they are not safe for use except under the supervision of a practitioner licensed by law to administer them.

On October 23, 2017, while this matter was pending appeal, the FDA took action against Defendants IML and DiMaggio by issuing a warning letter to Defendants IML and DiMaggio with regards to their sale of "Super DMZ 4.0." The FDA warned Defendants IML and DiMaggio that "Super DMZ 4.0" containing Ostarine constituted a "new drug" under Section 201(p) of the FD&C Act and a "prescription drug" under 503(b)(1)(A) of the FD&C Act, such that Defendants' sale of "Super DMZ 4.0" constitutes "[t]he introduction or delivery for introduction, or causing the introduction or delivery for introduction, of a new drug lacking an FDA-approved new drug application (NDA) is a violation of sections 301(d) and 505(a) of the FD&C Act [21 U.S.C. §§ 331(d) and 355(a)]." As such, Defendants' product was "misbranded, and the introduction or delivery for introduction, or causing the introduction or delivery for introduction, into interstate commerce of this product violates section 301(a) of the FD&C Act [21 U.S.C. § 331(a)]."

The FDA also concluded in a press release dated October 31, 2017 that Ostarine "presents significant potential safety risks to consumers who take them without the supervision of a practitioner licensed by law to administer such drugs."

AX will present evidence that it has suffered actual damages as a result of Defendants' false and misleading advertising practices. Defendants' own testimony will be used for the proposition that illicit conduct hurts everyone in the industry. The expert opinion of David Nolte will demonstrate damages in the form of Defendants' profits. Testimony from AX's founders will also show that AX suffered a decline in sales and a loss of consumer goodwill based on Defendants' false and misleading labels and advertisements.

## 2) DEFENDANTS' DEFENSES

**A.    Summary Statement of Defendants' Affirmative Defenses**

Defendants plan to pursue the following affirmative defenses:

<u>First Affirmative Defense</u>:  Lack of Capacity.

<u>Second Affirmative Defense</u>:  Speculative Damages.

<u>Third Affirmative Defense</u>:  Unclean Hands.

<u>Fourth Affirmative Defense (Part A)</u>:  Lack of Standing On Alleged Injury To Individual Consumers Or Purchasers.

<u>Fourth Affirmative Defense (Part B):</u>  No Private Right Of Action/Lack Of Standing On Alleged FDCA Violations.

<u>Fifth Affirmative Defense</u>:  Estoppel.

<u>Sixth Affirmative Defense</u>:  Failure to Mitigate.

### a.    Elements of Defendants' Defenses, and Key Evidence Relied Upon in Opposition

#### i.    First Affirmative Defense: Lack of Capacity

##### 1.    Elements

Defendants allege that the companies owning AX are defunct.

##### 2. Key Opposing Evidence

The companies owning AX are in good standing.

#### ii.    Second Affirmative Defense:  Speculative Damages

The parties have conferred and Defendants are not presenting their second affirmative defense of "speculative damages" as an affirmative defense.

#### iii.    Third Affirmative Defense:  Unclean Hands

##### 1.    Elements of Unclean Hands

1) Plaintiff engaged in inequitable conduct; and

2) Plaintiff's inequitable conduct relates to the subject matter of its claims.

##### 2.    Key Opposing Evidence for Unclean Hands

Plaintiff never engaged in misconduct related to the present claims. "The concept invoking the denial of relief is not intended to serve as punishment for extraneous transgressions, but instead is based upon 'considerations that make for the advancement of right and justice.'" *Keystone Driller Company v. General Excavator Company* (1933), 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293. *Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 349 (9th Cir. 1963); see also, *Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 350 (9th Cir. 1963) ("...the allowance of the defense of unclean hands, while it does deprive an unworthy plaintiff of the fruits of his misconduct, frequently multiplies the public injury in doing so. So here allowance of this defense in the face of the assumed fact of customer confusion permits that confusion to continue unabated, and even invites its extension to the ultimate state.")

Facts will demonstrate that AX has largely been the victim of third parties like Defendants, but has nonetheless taken accountability for its actions and attempted to rectify the marketplace. Moreover, unclean hands only applies when there is related misconduct leading up to and at the time of the suit. *See POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1099-1100 (C.D. Cal. 2016); *Mut. Pharm. Co. v. Watson Pharm., Inc.* 2009 WL 3401117, at *5 (C.D. Cal. Oct. 19, 2009).

### iv.  Fourth Affirmative Defenses:  Injury to Individual Consumers/No Private Right of Action/FDCA Predicate Acts

Counsel has agreed that these are not affirmative defenses and are not disputed.

### v.  Fifth Affirmative Defenses:  Estoppel

Pursuant to the meet and confer of counsel, Defendants are no longer pursuing this affirmative defense.

### vi. Sixth Affirmative Defense: Failure to Mitigate

Defendants contend that this is an affirmative defense to a Lanham Act claim. Plaintiff contends this is a contract defense. It is unclear how Plaintiff would mitigate losses other than filing a lawsuit seeking an injunction to stop the conduct alleged.

## 3) IDENTIFICATION OF ANTICIPATED EVIDENTIARY ISSUES

### a. Evidentiary Presumptions

#### i. Literal Falsity

If the plaintiff proves "literal falsity," the trier of fact must presume that consumers were misled, and the Court does not need to inquire into whether consumers were deceived or misled. "A plaintiff is entitled to relief under the Lanham Act on proof of literal falsity alone, as the court will assume that false statements actually mislead consumers." *POM Wonderful LLC v. Purely Juice, Inc.*, No. CV-07-02663, 2008 WL 4222045 at *11 (C.D. Cal. 2008); *see also Mutual Pharmaceutical Co. v. Ivax Pharmaceuticals, Inc.*, 459 F.Supp.2d 925, 933 (C.D. Cal. 2006) ("'Where the advertisement is literally false, a violation may be established without evidence of consumer deception.") (quoting *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002)).

#### ii. Intent to Deceive

If AX establishes that Defendants engaged in intentional deception, the trier of fact <u>must</u> then presume that the advertisement actually deceived or has the tendency to deceive a substantial segment of the audience, and Defendants have the burden of proving otherwise. *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) ("If Omicron intentionally misled consumers, we would presume consumers were in fact deceived and Omicron would have the burden of demonstrating otherwise."); *POM Wonderful LLC v. Purely Juice, Inc.*, No. CV-07-02663, 2008 WL 4222045, at *11 (C.D. Cal. July 17, 2008); ; *Harper House,*

1 *Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 208-09 (9th Cir. 1989); *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 92 (3rd Cir. 2000).

"It is not easy to establish actual consumer deception through direct evidence. The expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived. He who has attempted to deceive should not complain when required to bear the burden of rebutting a presumption that he succeeded." *U-Haul Intl., Inc. v. Jartran Inc.*, 793 F.2d 1034, 1041 (9th Cir. 1986).

In the case cited by Defendants – *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) – the Court held that "if Omicron intentionally misled consumers, we *would* presume consumers were in fact deceived and Omicron would have the burden of demonstrating otherwise" (emphasis added). The *William H. Macy* Court did not hold that the Court "might" or "may" presume; rather, the Court "would" presume, precisely because the presumption is neither optional, nor discretionary. Thus, if AX is able to prove intentional deception and invoke this presumption, *the burden shifts and Defendants must thereafter rebut the presumption. Id*.

### b. Damages

#### i. Actual Damages Need Not Be Established to Recover

AX need not prove actual damages in order to obtain a monetary award pursuant to 15 U.S.C. section 1117(a); rather, the preferred approach allows the Court to fashion relief, *including monetary*, based on the totality of the circumstances. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1146 (9th Cir. 1997).

"[A]lthough the Ninth Circuit in *Harper House* stated that 'actual evidence of some injury resulting from the deception is an essential element' in a suit for

damages under § 43(a), *id*. (emphasis omitted), a more recent decision holds that 'an inability to show actual damages does not alone preclude a recovery under section 1117.' *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1411 (9th Cir.1993) (quoting *Bandag, Inc. v. Bolser's Tire Stores,* 750 F.2d 903, 919 (Fed.Cir.1984)). Under *Lindy Pen,* the preferred approach allows the district court in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances. *Id.; see also Badger Meter, Inc. v. Grinnell Corp.,* 13 F.3d 1145, 1157 (7th Cir.1994) (stating that, even if a plaintiff is unable to demonstrate damages resulting from the defendant's § 43(a) violation, § 1117 allows the district court to award the plaintiff any just monetary award so long as it constitutes 'compensation' for the plaintiff's losses or the defendant's unjust enrichment and is not simply a "penalty" for the defendant's conduct)." *Id*. The testimony of David Nolte, Benjamin England, Michael Keplinger, Kevin Smith, and Robert DiMaggio will be offered in support of Plaintiff's damages.

### ii. Defendants' Profits

In addition to its own damages, AX is also separately entitled to any profits earned by Defendants that are attributable to the false advertising. 15 U.S.C. §§ 1117(a) and 1125(a); *Skydive Arizona, Inc. v. Quattrochi*, 704 F. Supp. 2d 841, 848 (D. Ariz. 2010) rev'd in part (on other grounds) sub nom. *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012) ("When seeking profits, the Plaintiff's only burden is to prove the Defendants' gross revenues. . . . The burden falls on the Defendant to prove all deductions and expenses that it believes are necessary to reach an accurate calculation of profits."); *Maier Brewing Co. v. Fleischmann Distilling Corp*., 390 F.2d 117, 124 (9th Cir. 1968) ("the defendant has the burden of proof as to any deductions from his gross sales.").

### 4) ISSUES OF LAW GERMANE TO THE CASE

The parties are largely in agreement concerning the substantive law and the elements of that law which are applicable to the facts of this case.

### 5) ISSUES TRIABLE TO A JURY

AX made a timely jury trial demand together with its Complaint filed on October 21, 2015 (ECF No. 1) as to all claims and issues so triable.

    **a. Issues Triable to the Jury**
   i. Whether any party violated the Lanham Act
   ii. Damages
   iii. Lack of capacity

    **b. Issues Triable to the Court**
   i. Unclean hands
   ii. Failure to mitigate
   iii. Injunctive relief
   iv. Attorneys' fees
   v. Statutory damages under the Lanham Act, 15 U.S.C. §1117, including disgorgement and treble damages.

### 6) RECOVERY OF ATTORNEYS' FEES

AX seeks the recovery of its attorneys' fees pursuant to 15 U.S.C. section 1117(a) ("Section 1117(a)"). Under Section §1117(a), AX will be entitled to an award of attorneys' fees if it is established that Defendants violated 15 U.S.C. section 1125(a), and did so maliciously, fraudulently, deliberately, or willfully. *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 615 (9th Cir. 2010).

AX will present evidence of the legal fees and costs incurred by AX to prosecute this action. Based on the evidence cited for Claim 1 above, including but not limited to the reports which put Defendants on notice that consumers were being deceived but which did not dissuade Defendants from continuing to use

deceptive advertisements, AX will demonstrate that Defendants acted both deliberately and willfully. AX will also present expert testimony from Dr. Perry Wilson on harm to the public, and Benjamin England on the illegality of Defendants' conduct, and why this litigation therefore confers a benefit on the public.

### 7) **PLEADED CLAIMS OR AFFIRMATIVE DEFENSES ABANDONED**

#### a. **AX's Claims**

Plaintiff will not pursue its state law claims.

#### b. **Defendants' Defenses**

Defendants will not pursue its Second Affirmative Defense for Speculative Damages. Defendants will not pursue its Fourth Affirmative Defenses for Lack of Standing On Alleged Injury To Individual Consumers Or Purchasers & Fourth Affirmative Defenses for No Private Right Of Action/Lack of Standing On Alleged FDCA Violations. Defendants will not pursue its Fifth Affirmative Defense for Estoppel.

Dated: October 15, 2018                                    TAULER SMITH LLP

                                                           By: */s/Robert Tauler*
                                                               Robert Tauler, Esq.
                                                               Attorney for Plaintiff
                                                               Nutrition Distribution, LLC

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed on October 15, 2018 with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to all CM/ECF participants, including Plaintiff's counsel of record.

Dated: October 15, 2018                    TAULER SMITH LLP


                                           By: */s/Robert Tauler*
                                               Robert Tauler, Esq.
                                               Attorney for Plaintiff
                                               Nutrition Distribution, LLC